### JAMES WOODSON v. THE STATE.

#### No. 1793. Decided June 14, 1899.

**1. Assignment of Errors as to Evidence—Practice on Appeal.**

Where no bill of exceptions was reserved to the admission of evidence at the trial, the court on appeal will not revise an error assigned upon said action.

**2. Appointment of Deputy Sheriff—Verdict.**

The failure of the sheriff to post a notice in the office of the county clerk specifying his deputies, can not be pleaded as ground for setting aside a verdict, where it appeared that one of his deputies had summoned the talesmen and waited upon the jury when they were deliberating upon defendant's case.

**3. Separation of the Jury—New Trial.**

Where it appeared that, after the parties had accepted part of the jury, but before they were impaneled and sworn, one of those accepted was permitted by the court to leave the jury box for a short time, this did not constitute such separation as would require or authorize a new trial.

**4. Requested Instructions—Practice.**

It is not error to refuse requested instructions upon matters fully embraced in and covered by the charge of the court as given.

APPEAL from the District Court of Polk. Tried below before Hon. L. B. HIGHTOWER.

Appeal from a conviction for illegal voting at a general election; penalty, two years imprisonment in the penitentiary.

The evidence is substantially as follows:

The State's witness Lyle testified: "I knew James Woodson in Novem-

ber, 1896. I was clerk at the election in Leggett precinct, Polk County, Texas, November 3, 1896. That was a general election held for the purpose of electing Governor and various State officers, congressmen, and various district, county, and precinct officers. Defendant came there and wished to vote. Some one called the attention of the presiding officer, Mr. Mack Singletary, to the fact that defendant was not a qualified voter. Mr. Singletary challenged his vote. He asked the defendant if he had been to the penitentiary, and Jim replied, 'Yes; I have been there three times for killing negroes.' Then he told him he could not vote. Jim said he had been pardoned. Mr. Singletary asked him if he would swear it, and he said he would swear, holding up his right hand. He then deposited through the window a ballot. It was folded up and looked like other ballots that had been put in. I could not say that it was a blank or a ballot."

Cross-examined: "Of course I did not see the inside of the ballot, and do not know whether it was a blank or a ballot. It might have been a blank ballot so far as I know. When defendant's vote was challenged and Mr. Singletary had sworn him, he then told the clerk to write 'sworn' after defendant's name on the poll list, which was done. Not seeing the inside of the ballot, I could not say of my own knowledge whether he voted for any officer to be chosen at that election or not."

A. B. Green testified: "I knew defendant; had a conversation with him in the county clerk's office a few days after the general election in 1896. In that conversation he stated that he had voted a straight Democratic ticket except for sheriff at the election in November, 1896."

A. R. Riley testified: "I knew James Woodson; he is the same James Woodson who was convicted in Galveston County in 1887 on the charge of false swearing, and whose punishment was assessed at two years confinement in the penitentiary. I was a witness in the case. He was indicted in Harris County, and the case was moved to Galveston County, where he was convicted."

The State introduced, over defendant's objection, a copy of the judgment of the Criminal Dstrict Court of Galveston County, in a case of the State of Texas v. James Woodson, whch judgment showed that it had been appealed to the Court of Criminal Appeals of the State of Texas; and also a copy of the mandate of said Court of Criminal Appeals in said cause, by one E. P. Smith, clerk of said court.

A. R. Railey, called by defendant, said: "I know well when the defendant was convicted, and that he had been convicted for two years in the penitentiary. Before the expiration of two years from the date of the sentence I met defendant on the streets in the city of Houston. I there had a conversation with him. It was about the time of the city election. Discussed voting with him, because defendant was asking me how he should vote. After conversing wth the defendant, I advised him to vote the Democratic ticket. I advised him to vote because I understood he had been pardoned. I would not have advised him to vote if I had not believed he had been pardoned."

Captain Sam Ashe testified for defendant: "I reside in Harris County,

Texas. I am an attached witness in this case in behalf of the State of Texas. I have known defendant Jim Woodson since 1862 and knew him during the E. J. Davis days. Old Jim was as faithful to his white friends and to the Democratic cause as a yard dog. I was present at the two trials of Jim in Harris County and at his trial in Galveston County. I consider his conviction a perversion of justice. I knew when he was convicted and that he was convicted for a term of two years, and before the two years had expired I met Jim on the streets of Houston. This was soon before the election, and I advised Jim how he should vote. I understood and believed he had been pardoned, and so believing, I suggested how he should vote and so advised him, which I would not have done for any consideration on earth had I not believed he had been pardoned. It is a fact that a voter would have to register before he could vote in Houston at this time. I knew full well when he was convicted for two years, and that he was back before his two years was out, and from this I concluded that he had been pardoned. I did understand that an effort had been made for his pardon, and by meeting him before his two years had expired I believed and understood that he had been pardoned, and so believing, I did advise him how to vote, which I never would have done had I not fully understood he had been pardoned."

The defendant testified: "Yes, sir, I was convicted to the penitentiary for two years. I did not serve my time out by several months. When I was convicted my friends all said they would get my pardon, and I received while there a lot of letters saying they would get my pardon for me. I can neither read nor write, and before my two years were out I was discharged. They gave me a paper with a big gold seal on it which I thought or took to be my pardon. I was so glad to get out that I went across town and got a drink and got me a little bottle of whisky, and the train from Huntsville to Phelps not being ready to go, I could not wait, so I walked to Phelps and took the train to my white folks in Houston. I got there a short time before the election and I talked with Captain Ashe, Judge Railey, and Colonel Stewart relative to my voting, and discussed with them the parties for whom I should vote. I went to register, and the register clerk hesitated to let me register. I then went to Colonel Chas. Stewart, who was congressman for our district, and he told me that I had a perfect right to vote, and gave me a note to that effect to the register clerk. I went at once and registered and voted, and have continually voted from that time to date of my indictment. At the time I consulted with Captain Ashe and Judge Railey and Colonel Stewart, Colonel Stewart's son was running on the Democratic ticket for city attorney. I did in fact register and vote in Harris County. Soon after this I moved to Polk County. I voted in every election, or thought I did so, believing I had a perfect right to vote. I have always voted a straight Democratic ticket, except when I voted against Mr. Standley for sheriff, and I have never been molested before. I certainly thought I had been pardoned and had a right to vote, else I never would have voted."

Cross-examined: "I can not read and write, Mr. Carter, and I thought the papers handed me when I was discharged from the penitentiary was my pardon. I was so glad to get out that I do not know what I have done with the papers. I have looked everywhere for it. Had Mr. Davis, one of my attorneys, to look through all my old letters for it, but he failed to find it. Yes, sir, when I offered the paper at the ticket window at Leggett there was something said about my right to vote, but I have no recollection of saying that I had killed three negroes, and if I said so, I of course was joking, for I had not in fact done anything of the kind. I was not sworn before I put in that paper. · I can not read and write, and do not know, as a matter of fact, that I voted for any officer to be chosen at that election. I have never had any trouble of this kind before, and have voted, or thought I had voted, at every election since I was discharged from the penitentiary, and have always voted a straight Democratic ticket, and I have done more than all the negroes in the county of Montgomery against the Republicans and fought 'niggers' for the white folks of Montgomery County, and Captain Hightower, judge of this bench, knows it. No, sir, I can not read and write, and I can not say· that I voted for any officer to be chosen on that election. I do not think I ought to be hurt now, because I honestly thought from what Colonel Stewart told me, and other matters of which I have mentioned, besides what Captain Ashe and Judge Railey said, that the paper I received when I was discharged was in fact a pardon, and if I had not thought so I never would have offered to vote. I did not intend to violate the law."

*James E. Hill* and *J. & F. Campbell*, for appellant.

*Robt. A. John,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of illegal voting at a general election.

Error is urged in regard to the action of the court permitting the State to introduce a copy of the judgment of the District Court of Galveston County showing appellant's conviction of a felony, and the mandate of the Court of Appeals showing the affirmance of the judgment. This was introduced to show his disqualification to exercise the right of suffrage. No bill of exceptions was reserved to this action of the court. It therefore will not be revised.

It is contended that J. A. Vinson was not a duly-qualified deputy sheriff. Vinson, it is asserted, summoned the talesmen, and also waited upon the jury in their retirement while deliberating upon appellant's case. This question was investigated upon motion for new trial and it was shown that he was a deputy sheriff, and had been since 1895, and that he was appointed a deputy sheriff after the election in 1898, took the oath of office, and qualified as such officer, and was the first deputy appointed by the sheriff. In this connection it is also contended that he was not

such deputy, because the sheriff had failed to post a notice in the office of the county clerk specifying his deputies. The failure of the sheriff to post said notice can not be pleaded here to set aside the verdict of the jury.

It is also contended that the verdict should be set aside because of the separation of the jury. This question was before the court on motion for new trial, and it was shown after the parties had accepted a part of the jury, and while the sheriff was summoning talesmen, the juror Gay asked permission of the court, and was permitted, to leave the jury box for a short time. This was before the jurors were sworn and before the panel had been completed. After the jury were sworn there was no separation, but they were kept together.

Appellant requested the court to charge the jury that if they should find from the evidence that defendant did vote as alleged, believing he had a right under the law to vote, or if, from the evidence, or a want of evidence, defendant voted, not knowing that his vote was illegal, or believing that he could vote, they should acquit. This matter was fully set forth in the charge given by the court, and reiterated in two special charges asked by defendant. The charge of the court and the special charges given called this matter sharply to the attention of the jury, and instructed them that if the defendant believed he had a right to vote at that election, or if he believed that he had been pardoned by the Governor, or if they had a reasonable doubt of either proposition, they should give him the benefit of the doubt, and acquit. In this respect the charge of the court was favorable to defendant. Finding no error in the record, the judgment is affirmed.

*Affirmed.*